# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 16, 2010          Decided July 23, 2010

No. 09-5162

THEODORE ROOSEVELT CONSERVATION PARTNERSHIP,
APPELLANT

v.

KENNETH LEE SALAZAR, IN HIS OFFICIAL CAPACITY AS THE
SECRETARY OF THE UNITED STATES DEPARTMENT OF
INTERIOR, ET AL.,
APPELLEES

Consolidated with 09-5193

Appeals from the United States District Court
for the District of Columbia
(No. 1:07-cv-01486)

*Sharon Buccino* and *Thomas R. Wilmoth* argued the causes
for appellants. With them on the briefs was *Donald G.
Blankenau*. *Benjamin H. Longstreth* entered an appearance.

*Robert H. Oakley*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With him on the brief were
*Andrew C. Mergen* and *Katherine Hazard*, Attorneys. *R. Craig*

*Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Michael B. Wigmore* and *Sandra P. Franco* were on the brief for intervenors Anadarko Petroleum Corporation and Warren Resources, Inc.

*Bruce A. Salzburg*, Attorney General, Attorney General's Office of State of Wyoming, *Jay Jerde*, Deputy Attorney General, and *David J. Willms*, Assistant Attorney General, were on the brief for intervenor State of Wyoming.

Before: SENTELLE, *Chief Judge*, ROGERS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: In March 2007, the Bureau of Land Management (BLM or Bureau), an agency within the Department of the Interior, released a Record of Decision that established the Atlantic Rim Natural Gas Field Development Project (Atlantic Rim Project). The project was designed to manage the resources of more than 270,000 acres of publicly and privately owned land in south-central Wyoming. Shortly after issuing the Record of Decision, the Bureau began authorizing specific applications for permission to drill wells that accorded with the project. Theodore Roosevelt Conservation Partnership, Natural Resources Defense Council, and other environmental organizations filed for declaratory and injunctive relief in the district court, arguing the Bureau's Record of Decision, its accompanying environmental impact statement, and subsequent drilling permits violated the National Environmental Policy Act, the Federal Land Policy and Management Act, and the Administrative Procedure Act. The district court granted summary judgment for the Bureau. The environmental organizations appeal from the judgment, alleging

errors in both the administrative proceedings and the district court's evidentiary rulings. We affirm the district court on all issues.

# I. Background

## A. Legal Framework

### 1. National Environmental Policy Act

The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.*, requires that federal agencies consider fully the environmental effects of their proposed actions. *See Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368, 374 (D.C. Cir. 1999) (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991)). It is an "essentially procedural" statute, meant to ensure "a fully informed and well-considered decision, not necessarily" the best decision. *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). To ensure a well-considered decision, NEPA requires that when an agency proposes a "major Federal action[] significantly affecting the quality of the human environment," the agency must prepare and circulate for public review and comment an environmental impact statement (EIS) that examines the environmental impact of the proposed action and compares the action to other alternatives. 42 U.S.C. § 4332(2)(C).

An EIS must be detailed, and it must be prepared in consultation with other federal agencies with special expertise relevant to the proposed action's environmental impact. *Id.* It must also assess the impact the proposed project will have in conjunction with other projects in the same and surrounding areas — "cumulative impact analysis" — and must include past, present, and reasonably foreseeable future actions of any agency

or person.  *See* 40 C.F.R. § 1508.25 (requiring that an EIS address cumulative impact); 40 C.F.R. § 1508.7 (defining cumulative impact); *see also TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006) (describing what a meaningful cumulative impact analysis must identify).  Finally, an EIS must explain in detail "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C)(ii).  Implicit in this statutory requirement "is an understanding that the EIS will discuss the extent to which adverse effects can be avoided." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351–52 (1989).  NEPA regulations, therefore, require an agency to discuss possible mitigation measures in the EIS and Record of Decision.  40 C.F.R. §§ 1508.25(b)(3), 1502.14(f), 1502.16(h), 1505.2(c).  The discussion must include "sufficient detail to ensure that environmental consequences have been fairly evaluated." *Methow Valley*, 490 U.S. at 352.  However, NEPA "does not require agencies to discuss any particular mitigation plans that they might put in place," nor does it "require agencies — or third parties — to effect any." *Citizens Against Burlington*, 938 F.2d at 206.

Not every decision requires an EIS, however.  If it is unclear whether an action will "significantly affect[] the quality of the human environment," 42 U.S.C. § 4332(2)(C), agencies may prepare an environmental assessment (EA).  *See* 40 C.F.R. § 1501.4(a)–(b).  An EA is a "concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact [(FONSI)]." 40 C.F.R. § 1508.9(a)(1).  The Department of the Interior has decided that its agencies, including the Bureau of Land Management, must prepare an EA for each proposed federal action, unless it is subject to a categorical exclusion, covered by an earlier environmental document, or the relevant bureau has already decided to prepare

5

an EIS. 43 C.F.R. § 46.300(a).

### 2. Federal Land Policy and Management Act

Bureau of Land Management actions are guided by the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1701 *et seq.* Under FLPMA, the Bureau must "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). Multiple use management requires balancing various competing uses of land — "including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values" — to optimally manage the land. 43 U.S.C. § 1702(c). The sustained yield principle "requires BLM to control depleting uses over time, so as to ensure a high level of valuable uses in the future." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004) (citing 43 U.S.C. § 1702(h)).

The Bureau uses a multi-step planning and decisionmaking process to fulfill this mandate under FLPMA. The Bureau begins by creating a land use plan for a geographic region. This plan is called a resource management plan (RMP). A resource management plan "describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps." *S. Utah Wilderness Alliance*, 542 U.S. at 59. It does not, however, include a decision whether to undertake or approve any specific action. 43 C.F.R. § 1601.0-5(n). Specific projects are reviewed and approved separately, but must conform to the relevant RMP. 43 C.F.R. § 1610.5-3(a).

### B. Factual Background

The Bureau's field office in Rawlins, Wyoming oversees the management of public lands within a 12.5 million acre area

in south-central Wyoming that straddles the Continental Divide. During the decisionmaking at issue in this case, the area was governed by a land use plan called the Great Divide Resource Management Plan.[1] Released in 1990 as part of the Bureau's FLPMA planning and decisionmaking process, the Great Divide RMP set forth long-term goals and objectives for the use and management of resources in the approximately four million acres of public land and additional one million acres of federal mineral estate that constitute the BLM-administered land within the Great Divide Resource Area. BUREAU OF LAND MANAGEMENT, RAWLINS DISTRICT OFFICE, GREAT DIVIDE RESOURCE AREA RECORD OF DECISION AND APPROVED RESOURCE MANAGEMENT PLAN 3 (November 1990) ("*Great Divide RMP*"). Under the RMP, the entire Great Divide Resource Area was open to oil and gas leasing, subject to restrictions around certain areas such as historic trails, sage grouse breeding grounds, and winter range for big game. *Id.* at 30, 32.

Within the Great Divide Resource Area sits the Atlantic Rim Project Area, which encompasses over 270,000 acres of publicly and privately owned land in Carbon County, Wyoming. *Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 270 (D.D.C. 2009) ("*TRCP*"). The area contains valuable oil and natural gas deposits, provides habitat to many species of wildlife, supplies grazing land for local ranchers' herds, and supports various human endeavors such as big game hunting and wildlife observation. Already the project area hosts a number of oil and gas wells, which account for more than five percent of Wyoming's total natural gas production. *Id.*

---

[1] The Great Divide RMP has been revised and is now called the Rawlins RMP. *See* BUREAU OF LAND MANAGEMENT, RAWLINS FIELD OFFICE, RECORD OF DECISION AND APPROVED RAWLINS RESOURCE MANAGEMENT PLAN (December 2008).

In 2001, the Bureau began the review and approval process for the Atlantic Rim Natural Gas Field Development Project (Atlantic Rim Project). *See* BUREAU OF LAND MANAGEMENT, FINAL ENVIRONMENTAL IMPACT STATEMENT FOR THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT, CARBON COUNTY, WYOMING, at 1-1 (November 2006) ("*FEIS*"); Notice of Intent, 66 Fed. Reg. 33,975 (June 26, 2001). Because the project would have a substantial environmental impact, the Bureau released a draft EIS in December 2005 as required under NEPA. BUREAU OF LAND MANAGEMENT, DRAFT ENVIRONMENTAL IMPACT STATEMENT FOR THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT, CARBON COUNTY, WYOMING (December 2005) ("*DEIS*"). The Bureau finalized the EIS in November 2006. *FEIS* (introductory letter). In March 2007, the Bureau released its Record of Decision explaining, based on its analysis in the EIS, the action it decided to undertake. BUREAU OF LAND MANAGEMENT, RECORD OF DECISION, ENVIRONMENTAL IMPACT STATEMENT FOR THE ATLANTIC RIM NATURAL GAS FIELD DEVELOPMENT PROJECT, CARBON COUNTY, WYOMING (March 2007) ("*ROD*"); *see also* Notice of Availability, 72 Fed. Reg. 28,518 (May 21, 2007).

The Atlantic Rim Project's Record of Decision anticipates the Bureau approving approximately 2000 new natural gas wells in the project area over the span of 30 to 50 years. *ROD* at 1–3. This drilling is expected to cause surface disturbance to approximately 13,600 acres during the life of the project. That disruption will impair certain human activities, decrease soil quality, encourage erosion, diminish grazing land, and release various gases that contribute to ground-level ozone pollution. The project will also affect the population of the greater sage grouse, a species listed as a "Sensitive Species" by the Bureau. *FEIS* at 3-94. According to the Bureau's Manual on Special Status Species, such as sensitive species, the Bureau shall work "to improve the condition of special status species and their

habitats to a point where their special status recognition is no longer warranted." BUREAU OF LAND MANAGEMENT, BLM MANUAL 6840 - SPECIAL STATUS SPECIES MANAGEMENT, at .01 (2001). The manual further states that any actions or projects "authorized by BLM shall further the conservation of . . . special status species." *Id.* at .12. Currently, the Atlantic Rim Project Area is abundantly covered with sage brush — habitat well suited for the greater sage grouse's nesting and breeding. However, because the Atlantic Rim Project will disturb so much surface area, the greater sage grouse may be expected to suffer a long-term decline in population, precluding the improvement of the sage grouse's Sensitive Species status. *See FEIS* at 4-69, 4-83.

To mitigate the environmental damage the project will cause, the Record of Decision and final EIS outline conditions of approval for any proposal to drill. Overall surface disturbance in the project area cannot exceed 7600 acres at any given time, and total surface disturbance over the life of the project is capped at 13,600 acres. *ROD* at B-4. The decision also outlines conditions of approval designed to protect plant species, wildlife, and human activities. For example, drilling may not occur with a 0.25 mile radius of sage grouse breeding grounds, and drilling and other human activity is forbidden in certain areas at certain times of the year. *Id.* at B-16. The Bureau also included in the Record of Decision an adaptive management plan, which identifies various goals for continued monitoring and mitigation of the project's adverse impacts on wildlife and other resources during the life of the project.

Though the Atlantic Rim Project outlined the basic conditions of approval for drilling applications in the area, the Record of Decision left many specific resource management decisions for a case-by-case determination in each drilling application submitted over the life of the project. While public

involvement in these applications is less substantial than in the preparation of an EIS, the Bureau stated in the Atlantic Rim Record of Decision that it would post public notice of each application to drill. Also, as required by regulation, the Bureau would conduct an environmental assessment (EA) before approving any specific application. *See* 43 C.F.R. § 46.300(a).

Shortly after releasing the Record of Decision in March 2007, the Bureau approved some applications for permission to drill. When an application is approved, by itself or in concert with other applications, the Bureau's approval is known as a plan of development, or POD. These plans of development specify where and how a well may be drilled, where supporting infrastructure such as roads may be built, and the precise mitigation measures that must be followed. On June 28, 2007, the Bureau approved two PODs in the Catalina unit of the project area for a total of 39 new wells. The approvals were accompanied by EAs with findings of no significant impact. On August 16, 2007, the Bureau approved two PODs in the Sun Dog unit for a total of 51 new wells. Again, the approvals were accompanied by EAs with findings of no significant impact.

## C. Procedural Background

In June 2007, Theodore Roosevelt Conservation Partnership (TRCP) and various other environmental groups filed appeals to the Interior Board of Land Appeals within the Department of the Interior, pursuant to 43 C.F.R. § 4.410(a) ("Any party to a case who is adversely affected by a decision of an officer of the Bureau of Land Management . . . shall have a right to appeal to the Board [of Land Appeals] . . . ."). *See also* 43 C.F.R. § 4.1(b)(3). Their appeals challenged the validity of the Atlantic Rim Project Record of Decision and final EIS. TRCP also petitioned the Board to stay the effect of the Record of Decision during the pendency of the appeals. The Board denied the

petition. *Theodore Roosevelt Conservation P'ship*, IBLA 2007-208 (Sept. 5, 2007) (order). TRCP later dismissed its appeal before the Board.

During the pendency of TRCP's stay petition before the Board, TRCP filed in the district court a complaint requesting injunctive relief against the Department of the Interior and the Bureau. Shortly thereafter, Natural Resources Defense Council and other environmental groups (collectively, NRDC) filed a similar complaint. Three energy companies that planned to drill in the Atlantic Rim Project Area — Anadarko Petroleum Co., Warren Resources, Inc., and Double Eagle Petroleum Co. — successfully moved to intervene as defendants in both cases, as did the state of Wyoming. In 2007, the district court denied a motion by NRDC for preliminary injunctive relief. *Natural Res. Def. Council v. Kempthorne*, 525 F. Supp. 2d 115, 117 (D.D.C. 2007).

The court declined to consolidate TRCP and NRDC's cases, but issued a single decision granting summary judgment in both cases in favor of the Department of the Interior, the Bureau, and the intervenors. *TRCP*, 605 F. Supp. 2d at 269. The groups separately appealed the district court's grant of summary judgment, citing, *inter alia*, the court's decision to exclude certain evidence that was not part of the administrative record. This court consolidated the appeals. Later, we granted the motion of Double Eagle Petroleum to withdraw as a party to the appeal.

## II. Analysis

As a threshold matter, we address the issue of standing. Though neither appellant asserted the required elements for standing in their joint brief in this court, both TRCP and NRDC did supply to the district court declarations that were sufficient

to establish standing.  Accordingly, we  hold that Appellants have standing to bring their claims before us.

To establish standing, a party must, as a constitutional minimum, show that (1) it suffers an "injury in fact" that is concrete, particularized, and actual or imminent, (2) there is a causal relationship between the injury and the conduct complained of, and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Each organization in this case relies on associational standing, whereby a group brings suit on behalf of its members.  Associational standing requires an organization to show that  "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit."  *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

Before the district court, TRCP and NRDC submitted declarations from members of their organizations that established those members' past and intended future use of the land governed by the Atlantic Rim Project, and the particular harm to that activity posed by the Atlantic Rim Project and approved PODs.  The injuries asserted satisfy the *Lujan* requirements, giving the individuals standing to sue in their own right.  Because TRCP and NRDC's claims and requested relief are germane to their organizational purposes and do not require any individual member to participate in the lawsuit, the organizations have standing to sue on behalf of those members. We note that only NRDC's declarations establish standing for the Catalina and Sun Dog PODs in particular.  However, only NRDC argued that those PODs violated NEPA, and so the relevant party established the necessary standing.

Turning to the merits of TRCP's and NRDC's arguments, we review de novo the district court's grant of summary judgment. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 998 (D.C. Cir. 2008). As for the disputed evidentiary rulings, this court reviews the "district court's refusal to supplement the administrative record for abuse of discretion." *Novartis Pharmaceuticals Corp. v. Leavitt*, 435 F.3d 344, 348 (D.C. Cir. 2006).

Neither NEPA nor FLPMA provides a private right of action, so the Administrative Procedure Act (APA) supplies the applicable vehicle for review of the Bureau's actions. By the terms of the APA, a reviewing court shall set aside any agency action, finding, or conclusion that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

On appeal to this court, TRCP and NRDC share some arguments, but not all. However, because each group established standing for the claims it makes, and because the relief sought is not affected by which group made which argument, for the sake of simplicity we will not distinguish between their arguments. Instead, we refer collectively to TRCP and NRDC as "Appellants" and credit all arguments to them jointly. Those arguments are as follows:

(1) the scope of the Atlantic Rim Project exceeded the scope of the Great Divide RMP, violating both FLPMA and NEPA;

(2) the Bureau's reliance on the "Scheffe method" to estimate ozone concentrations violated NEPA and was arbitrary and capricious;

(3) the Bureau's exclusion of certain possible future projects from its cumulative impact analysis in the Record of Decision was arbitrary and capricious and a violation of

NEPA, and the district court erred when it excluded extra-record evidence about the cumulative impact analysis;

(4) the adaptive management plan and other mitigation efforts in the Record of Decision were too vague to satisfy NEPA;

(5) the Atlantic Rim Project violated the multiple use and sustained yield goals of FLPMA; and

(6) the Bureau failed to provide sufficient public notice and opportunity for public comment on the environmental assessments for the PODs as required by NEPA.

We address each argument in turn.

## A. The Atlantic Rim Project's Conformity with the Great Divide RMP

When the approval process for the Atlantic Rim Project began in 2001, the Great Divide RMP was more than a decade old. In February 2002, the Bureau published a notice of intent to revise the Great Divide RMP. 67 Fed. Reg. 8701 (Feb. 25, 2002). The Bureau completed the Atlantic Rim Project Record of Decision in March 2007 before making the RMP revision available for public comment the following January. 73 Fed. Reg. 881 (Jan. 4, 2008) (announcing availability of the draft of the revised RMP). Appellants argue this violated the Council on Environmental Quality's regulations implementing NEPA.

Section 1502.1 of 40 C.F.R. sets forth the purpose of an EIS: ensuring that NEPA's policies and goals "are infused into the ongoing programs and actions of the Federal Government." Section 1502.2(f) specifies that, to achieve that purpose, agencies preparing an EIS "shall not commit resources prejudicing the selection of alternatives before making a final decision." Further, § 1506.1(a) provides that "[u]ntil an agency

issues a record of decision . . . no action concerning the proposal shall be taken which would . . . [l]imit the choice of reasonable alternatives." According to Appellants, the Atlantic Rim Project improperly precommitted the RMP revision to approve at least as much new development as the Atlantic Rim Project had already approved.

This argument presupposes that the Atlantic Rim Project exceeded the existing 1990 RMP because the restriction on precommitting resources can apply only if the project was "not covered by an existing program statement." 40 C.F.R. § 1506.1. Appellants' argument therefore turns on whether the Atlantic Rim Project was covered by the existing RMP. If the RMP covered the Atlantic Rim Project, the Bureau did not improperly precommit resources as it revised the Great Divide RMP. If, however, the RMP did not cover the project, Appellants argue, the Bureau not only precommitted resources in violation of NEPA regulations, but also violated FLPMA and its implementing regulations by not managing the area in accordance with the RMP. *See* 43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands . . . in accordance with the land use plans developed by him . . . ."); 43 C.F.R. § 1610.5-3 ("All future resource management authorizations and actions . . . shall conform to the approved plan.").

The draft EIS for the Great Divide RMP anticipated approximately 1440 oil and gas wells being drilled between 1987 and 2007. *See* BUREAU OF LAND MANAGEMENT, DRAFT RESOURCE MANAGEMENT PLAN/ENVIRONMENTAL IMPACT STATEMENT FOR THE MEDICINE BOW AND DIVIDE RESOURCE AREAS, RAWLINS DISTRICT, WYOMING 220 (April 1987). Over the next two decades, however, the Bureau approved projects in the Great Divide that authorized wells far in excess of that original estimate. By the time the Atlantic Rim Project was approved, the Bureau had approved more than 3600 wells in the

Great Divide Resource Area. The Atlantic Rim Project itself authorized another 2000. Appellants argue that the Atlantic Rim Project approved development so far in excess of the RMP projection that it rendered the project inconsistent with the RMP, violating NEPA and FLPMA. 40 C.F.R. §§ 1502.2(f), 1506.1 (NEPA regulations); 43 U.S.C. § 1732(a) (FLPMA statute). But while the Bureau's various projects did far exceed the projection of 1440 wells described in the draft EIS for the Great Divide RMP, there was no NEPA or FLPMA violation.

The final EIS and Record of Decision for the Great Divide RMP did not include the 1440 well estimate. Instead, they simply said that the entire planning area was available for oil and gas leasing subject to certain environmental restrictions. BUREAU OF LAND MANAGEMENT, PROPOSED RESOURCE MANAGEMENT PLAN AND FINAL ENVIRONMENTAL IMPACT STATEMENT FOR THE GREAT DIVIDE RESOURCE AREA 52 (June 1988); *Great Divide RMP* at 30. Even if the 1440 well estimate were incorporated in the final decision, the estimate would not impose a hard cap on the actual number of wells that can be drilled in the Great Divide Resource Area. Appellants concede this point, which is consistent with the Interior Board of Land Appeals' interpretation of reasonably foreseeable development scenarios in RMPs. According to the Board, a projection like the one in the Great Divide draft EIS serves as an analytical baseline for evaluating environmental impacts, not "a point past which further exploration and development is prohibited." *Wy. Outdoor Council*, 164 IBLA 84, 99 (2004); *see also Biodiversity Conservation Alliance*, 174 IBLA 1, 9 (2008).

Moreover, while Appellants claim that "vastly" more than 1440 wells have been drilled in the lands covered by the Great Divide RMP, they do not cite evidence demonstrating that the environmental impact of that drilling has exceeded the impact contemplated by the Great Divide RMP. As the Director of the

BLM explained, "exceeding the number of wells projected . . . may not result in exceeding the predicted level of environmental effects." Instruction Memorandum No. 2004-089 from the BLM Director to all State Directors, at Attachment 1-2 (Jan. 16, 2004). A 2004 analysis found "about 3,700 acres of long term disturbance as yet unallocated under the Great Divide RMP," despite the existence of "about 3000 active wells in the [Rawlins] Field Office." Bureau of Land Management, Draft Briefing Paper, Interim Development Program at the Atlantic Rim EIS Project Area (June 7, 2004). By April 2005, a BLM official observed: "While originally it appeared we were completely constrained by the RMP revision . . . , today we are recognizing that there is still some [long term disturbance] acres available under the Great Divide RMP . . . , thus making the EISs we've been working on the limiting factor instead of the RMP revision." Email from D. Simons, BLM Rawlins Field Office, to M. Storzer, BLM Rawlins Field Office (Apr. 26, 2005).

Under these circumstances it was reasonable for the Bureau to decide that the existing Great Divide RMP encompassed the development proposed by the Atlantic Rim Project. Therefore, the Bureau's decision does not violate the NEPA prohibition of precommitting resources.

## B. The Scheffe Method

The drilling activities and associated development anticipated by the Atlantic Rim Project will emit pollution, including nitrous oxides and volatile organic compounds that can raise ground-level ozone concentrations. As part of the project's EIS, the Bureau estimated the effect the proposed development would have on ozone concentrations using a mathematical model developed in 1988 called the "Scheffe method." Appellants maintain that the Scheffe method was

outdated by the time it was used in the Atlantic Rim Project's EIS. Therefore, argue Appellants, the Bureau violated NEPA because using an outdated method meant the agency could not take a sufficiently "hard look" at the project's impact on ozone concentrations. *See Methow Valley*, 490 U.S. at 350 (explaining that NEPA's procedures require agencies to take a "hard look" at environmental consequences). In addition, Appellants argue that using the Scheffe method violated 40 C.F.R. § 1502.24, which requires that an agency ensure the scientific integrity of their environmental impact statements. We reject both arguments.

One of the comments for the Atlantic Rim Project EIS argued that the Scheffe method was obsolete because of its deficiencies compared with newer models. In response to this comment and related comments on other projects, the Bureau produced a memorandum that in effect admitted the Scheffe method used outdated measurements and assumptions. The Bureau therefore adopted a newer method for future air quality assessments. However, it continued to use estimates derived using the Scheffe method for the Atlantic Rim Project EIS. *See* BLM, Information Memorandum for State Director, Ozone Issue and BLM-WY Response, at 1 (Aug. 31, 2006) ("*Ozone Issue Letter*").

In the Atlantic Rim Project's final EIS and Record of Decision, the Bureau justified its decision to keep the estimates derived by the Scheffe method, explaining that it is an "overly conservative" screening level modeling tool, *FEIS* at 4-12; *see id.* App'x F, 44 (noting that problems with the Scheffe model were likely to result in "overestimates of the actual [ozone] impacts that would occur"), and was an acceptable method at the time the air quality analysis was conducted, *ROD* at 7. The Record of Decision also established that the Bureau will require monitoring of ozone and other pollutants and use adaptive

management to mitigate impacts if needed.  *Id.*

When the Bureau decided in August 2006 to use a different methodology for future air quality analyses, the Atlantic Rim Project's air quality analysis had been completed one month earlier.  *Compare Ozone Issue Letter with FEIS* at App'x F.  Going back to recalculate ozone impacts would have delayed the Atlantic Rim Project schedule.   And because a still newer method could have been developed during that re-analysis, the process could have been endless. *See W. Coal Traffic League v. ICC*, 735 F.2d 1408, 1411 (D.C. Cir. 1984) (declining to require an agency to "behave like Penelope, unraveling each day's work to start the web again the next day").   Given the Bureau's conclusion that the Scheffe method was an acceptable and conservative method when the analysis was carried out, the Bureau reasonably decided to retain the old estimates rather than undertake a new air quality analysis.  On these facts, as noted by the district court, "an agency's reliance on outdated data is not arbitrary or capricious, 'particularly given the many months required to conduct full [analysis] with the new data.'" *TRCP*, 605 F. Supp. 2d at 273 (quoting *Village of Bensenville v. FAA*, 457 F.3d 52, 71 (D.C. Cir. 2006)).

The Record of Decision explains that the Scheffe method was an acceptable method at the time the air quality analysis was completed.  *ROD* at 7, E-8.   Before undertaking the analysis, the Bureau contacted various interested agencies, including the Environmental Protection Agency, the National Park Service, and the Wyoming Department of Environmental Quality.   None objected to using the Scheffe method.   In addition, the final EIS discusses the weaknesses of the Scheffe method, but notes that those weaknesses likely resulted in "overestimates of the actual [ozone] impacts that would occur." *FEIS* at App'x F, 44. *See also Wy. Outdoor Council*, 176 IBLA 15, 33 (2008) (quoting the original 1988 paper establishing the

Scheffe method, which said the estimates produced "should be interpreted as *conservative predictions* which would exceed ozon[e] formation produced by actual episodic events"). This was a substantive response to the criticisms of the Scheffe method that satisfied both NEPA's "hard look" requirement and the APA arbitrary and capricious standard. *See Methow Valley*, 490 U.S. at 350; 5 U.S.C. § 706(2)(A).

The Bureau's discussion of the Scheffe method's validity also explains why, contrary to Appellants' contention, 40 C.F.R. § 1502.24 was not violated. That regulation requires agencies to ensure the scientific integrity of their environmental impact statements. 40 C.F.R. § 1502.24. It does not require that an agency employ the best, most cutting-edge methodologies. In this case, the Bureau reasonably concluded that the estimates derived by the Scheffe method were adequate and did not need to be recalculated using a different method.

Appellants further contend that even if retaining the Scheffe-derived estimates in the final EIS was not arbitrary and capricious or a violation of NEPA, drafting environmental assessments for the PODs necessitated the recalculation of the proposed wells' likely effects on ozone concentrations. When the Bureau conducted environmental assessments for the PODs in the Catalina and Sun Dog units, it referred back to the ozone concentration estimates in the Atlantic Rim Project's EIS that were produced using the Scheffe method, at a time when the Bureau had already decided not to use the Scheffe method any longer. Therefore, argue Appellants, the Bureau should have gone back to "fill in any holes" in the original ozone impact assessment when it carried out the drilling permit environmental assessments. Appellants Br. at 40 (citing *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1078 (9th Cir. 2002)).

This argument is also unavailing. In general, an agency preparing an environmental assessment for a drilling permit is not required to reevaluate the analyses included in the relevant project's EIS. Instead, NEPA regulations allow "tiering," which permits site-specific environmental analyses to incorporate by reference the general discussions of prior, broader environmental impact statements. 40 C.F.R. § 1508.28. The regulations expressly provide that "[t]iering is appropriate when the sequence of statements or analyses is . . . [f]rom a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a *site-specific statement or analysis*." § 1508.28(a) (emphasis added). While courts have required environmental assessments to analyze certain impacts for the first time when the broader analysis did not address the impact in question *at all*, *see, e.g.*, *Kern*, 284 F.3d at 1078, this is not such a case. The Atlantic Rim Project did address the impact drilling would have on ozone concentrations. Tiering a POD's environmental assessment to that analysis in compliance with the governing regulation is hardly arbitrary and capricious. Appellants' objection that a method used in the earlier analysis had been surpassed by superior technology by the time of the tiered analysis does not invalidate the later assessment. Projects like the Atlantic Rim Project are designed to span several decades, and it is not surprising that scientific conventions and protocols develop and change in that time (though here they did so sooner rather than later). NEPA does not limit tiering to analyses still on the scientific cutting edge. Nothing in the law requires agencies to reevaluate their existing environmental analyses each time the original methodologies are surpassed by new developments.

## C. Cumulative Impact Analysis

Appellants next argue that the Bureau erred in its assessment of the cumulative impact of the Atlantic Rim Project.

Pursuant to 40 C.F.R. § 1508.25, the EIS for the Atlantic Rim Project must reflect not only the direct impact of the project itself, but the "cumulative effects" on the environment of the project "incorporating the effects of other projects into the background 'data base' of the project at issue." *Grand Canyon Trust v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002) (quoting *Coalition on Sensible Transp. v. Dole*, 826 F.2d 60, 70–71 (D.C. Cir. 1987)). "Cumulative effect" is defined in the applicable regulations as

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

Appellants assert that in light of its obligation to include cumulative impact, and the regulatory description of what that encompasses, the Bureau was arbitrary and capricious in not including within the environment impact statement for the Atlantic Rim Project the environmental effects of two other potential development projects near the Atlantic Rim area: the Hiawatha Regional Energy Development Project and the Continental Divide–Creston Natural Gas Project. Those two projects began years after the Bureau began its analysis on the Atlantic Rim Project in 2001, but, at least in conceptualization, overlapped in time with the Bureau's consideration of its EIS for the Atlantic Rim Project. More specifically, the Bureau began its analysis of the Atlantic Rim Project in 2001 with the publication of a notice of intent to prepare an EIS. 66 Fed. Reg. 33,975 (June 26, 2001). Unrelated to that development, in April

and November 2005, energy companies submitted proposals to the Bureau to drill wells in the Continental Divide–Creston area in Carbon and Sweetwater Counties, Wyoming. *See* Notice of Intent, 71 Fed. Reg. 10,989 (March 3, 2006). In December 2005, the Bureau finished the Atlantic Rim Project draft EIS. *DEIS* (introductory letter). On March 3, 2006, the Bureau published in the Federal Register a notice of intent to prepare an EIS for the Continental Divide–Creston Natural Gas Project, incorporating both the April and November 2005 proposals. Notice of Intent, 71 Fed. Reg. 10,989. Also in March 2006, various natural gas development companies submitted a proposal to drill wells in parts of Sweetwater County, Wyoming and Moffat County, Colorado. The Bureau named the proposed project the Hiawatha Regional Energy Development Project and on September 6, 2006, published a notice of intent to prepare an EIS. Notice of Intent, 71 Fed. Reg. 52,571. The Bureau completed the Atlantic Rim final EIS in November 2006, and the Record of Decision in March 2007. *FEIS* (introductory letter); *ROD* (title page). In short, by the time the Bureau completed the Atlantic Rim Project Record of Decision, the Hiawatha and Continental Divide–Creston projects were still in the early stages of development, with only notices of intent to mark their progress. Or, as the district court put it, "the Continental Divide–Creston and Hiawatha projects had only begun to work their way through the NEPA approval process when the FEIS was compiled." *TRCP*, 605 F. Supp. 2d at 278 (internal quotation marks and citation omitted).

We agree with the district court that the incipient notion of the two projects expressed in notices of intent to prepare an EIS for each did not establish reasonable forseeability of the incremental impact of those projects in connection with the Atlantic Rim Project for purposes of § 1508.7. The history of the Atlantic Rim Project itself demonstrates that projects in their infancy have uncertain futures. In early 2000, a company

proposed drilling 96 wells in three areas within what would become the Atlantic Rim Project Area. The Bureau began an environmental assessment of the proposed project in February 2000, but before the analysis was completed, the proposing company sold its leasehold. The new owners withdrew the 96-well project application in May 2001. Later that month, the new owners submitted a much larger proposal encompassing more land, which proposed drilling up to 3880 coalbed methane wells. *FEIS* at 1-1. When the Bureau published its notice of intent to prepare an EIS for the Atlantic Rim Project in June 2001, the notice reflected the new proposal. 66 Fed. Reg. 33,975 (June 26, 2001); *see TRCP*, 605 F. Supp. 2d at 270. By the time the Bureau completed the draft EIS in December 2005, well operators had revised their original estimate to 2000 wells. *DEIS* at S-1. In other words, the proposed size of the Atlantic Rim Project varied widely over time, and the Bureau did not necessarily know the actual scope of the project, much less its environmental impact, until several years after the Bureau published its notice of intent to prepare an EIS.

Granted, a project need not be finalized to be "reasonably foreseeable" under 40 C.F.R. § 1508.7. But neither was it arbitrary and capricious for the Bureau to omit from its cumulative impact analysis other projects for which nothing had been completed except notices of intent, each published after the Atlantic Rim Project's draft EIS had been released. The Bureau did not violate NEPA by concluding that these projects were too preliminary to meaningfully estimate their cumulative impacts in the Atlantic Rim Project EIS.

Appellants argue that under *Kleppe v. Sierra Club*, 427 U.S. 390 (1976), agencies must consider the cumulative impact of all concurrently pending proposals, including proposals with uncertain futures. However, contrary to Appellants' assertion, *Kleppe* does not mandate that a cumulative impact analysis

include all existing proposals. Appellants' Br. at 42 (citing 427 U.S. at 406, 410). In *Kleppe*, the Court considered, among other issues, whether the Department of the Interior was required to prepare a single EIS for all proposed coal projects in a region. 427 U.S. at 409–10. While agreeing that NEPA "may require a comprehensive impact statement in certain situations where several proposed actions are pending at the same time," *id.* at 409 (citing § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C)), the Court held the Department of the Interior did not act arbitrarily when it decided not to prepare a single EIS for all the proposed actions in the region, *id.* at 414.

It is true that under 42 U.S.C. § 4332, "when several proposals for [] related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together." *Kleppe*, 427 U.S. at 410. But as this court has explained, the purpose of the cumulative impact requirement "is to prevent agencies from dividing one project into multiple individual actions 'each of which has an insignificant environmental impact, but which collectively have a substantial impact.'" *Natural Res. Def. Council*, *Inc. v. Hodel*, 865 F.2d 288, 297–98 (D.C. Cir. 1988) (quoting *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985)). An agency need not revise an almost complete environmental impact statement to accommodate new proposals submitted to the agency, regardless of the uncertainty of maturation.

Before the district court, Appellants also sought to introduce evidence about a draft EIS from September 2002 that discussed wind energy development on Bureau-administered lands in the western United States. Appellants planned to use the evidence to argue the Atlantic Rim Project's cumulative impact analysis arbitrarily and capriciously failed to consider the

impact of certain wind energy development projects. The district court, however, excluded the evidence which was not a part of the administrative record. *See* 605 F. Supp. 2d at 278 n.10. The court therefore also refused to entertain Appellants' claims based on that evidence that the cumulative impact analysis was deficient for failing to consider the wind projects. *Id.* We hold that the district court's decision was not an abuse of discretion.

The APA limits judicial review to the administrative record "except when there has been a 'strong showing of bad faith or improper behavior' or when the record is so bare that it prevents effective judicial review." *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). True, "it may sometimes be appropriate to resort to extra-record information" to determine whether an administrative record is deficient. *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989). But this is the exception, not the rule. Appellants offer nothing to convince us that the district court abused its discretion by following the general rule for review of administrative records.

"Persons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions.'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (alteration in original) (quoting *Vermont Yankee*, 435 U.S. at 553). In this case, Appellants had ample opportunity to submit the evidence of the environmental impact of wind energy development to the Bureau as it crafted the Atlantic Rim Project EIS, but they did not. Appellants had ample opportunity to seek to introduce the evidence before the Interior Board of Land Appeals, but they did not. The district court was entirely within its discretion, therefore, to conclude it was unnecessary to let Appellants introduce evidence in court that they had never sought to

introduce to the agency.

Appellants hint at agency impropriety when they cite *Environmental Defense Fund, Inc. v. Blum*, 458 F. Supp. 650 (D.D.C. 1978), for their argument. There, the court explained that an agency may not "skew the record for review in its favor by excluding from that record information in its own files which has great pertinence to the proceeding in question." *Id.* at 661 (internal quotation mark omitted). However, the extra-record evidence in that case was highly (and obviously) pertinent material, much of which "was not the subject of adversarial comment because it remained unknown to the plaintiff and was considered without plaintiff's knowledge." *Id.* at 660. That is not the case here. While it is true the wind energy documents were created by the Bureau itself, they were also available to Appellants. Nor is there anything to suggest the Bureau actually considered those documents without Appellants' knowledge. An agency does not "skew" the administrative record when it does not include agency documents that were not used in making its decision but were available to commenters.

### D. Adaptive Management Plan

Appellants next argue that the Atlantic Rim Project's mitigation measures, and specifically its adaptive management plan, violate NEPA's mandate to discuss possible mitigation measures in its EIS and Record of Decision. *See* 40 C.F.R. §§ 1508.25(b)(3), 1502.14(f), 1502.16(h), 1505.2(c); *see also supra* at 4. They also claim that the adaptive management plan violates NEPA's requirement to evaluate environmental impacts *before* actions are taken. *See* 40 C.F.R. § 1500.1(b) (explaining that the purpose of NEPA's procedures is to make information available before decisions are made). Again, we reject both arguments.

According to Appellants, the Atlantic Rim Project's adaptive management plan is the "lynchpin" of the project's mitigation and monitoring efforts. They argue this court therefore should look only at the adaptive management plan to determine whether the Bureau satisfied the requirements of NEPA. This argument misunderstands the requirements of NEPA. Nothing in that act or its implementing regulations restricts a court's review to only the primary mitigation effort in a project rather than the project's entire response. We will not restrict our analysis to the adaptive management plan alone.

The Atlantic Rim Project's Record of Decision and EIS contemplate several mitigation techniques. As described above, *supra* at 8, surface disturbance is limited to 7600 acres at any time, and 13,600 acres over the life of the project. *ROD* at B-4. Disturbance is also limited to certain areas to protect wildlife and plant species. For example, to mitigate disturbance of the greater sage grouse, surface disturbance or occupancy is completely prohibited within one-quarter mile of occupied sage grouse breeding grounds, and within two miles of those grounds during the breeding season between March 1 and July 15. *FEIS* at 3-96, E-7. Permanent high-profile structures are limited within one mile of sage grouse breeding grounds. *Id.* at E-7. Generator noise must be muffled in order to minimize disturbance to mating calls. *Id. See also NRDC*, 525 F. Supp. 2d at 121–22 (outlining these and other measures protective of sage grouse).

The project's adaptive management plan endeavors to monitor the development's effects on the environment and mitigate those effects as necessary. The plan outlines various performance goals for the Bureau to strive for in collaboration with other state and federal agencies. *ROD* at 19. For example, the Bureau will attempt to "maintain functional migration routes," "provide an adequate amount of suitable, undisturbed

crucial winter range for big game animals," "provide well-dispersed sage-grouse" habitats, "maintain adequate water quality" for sensitive populations of fish, and "minimize deaths and injuries of livestock due to development." *Id.* The wildlife monitoring and protection measures developed to fulfill these goals are not fixed, but flexible. The Bureau may modify them "as allowable and as deemed appropriate by BLM in consultation with other agencies, [well] Operators and interested parties." *ROD* at B-15 (speaking specifically of wildlife protection measures); *see id.* at E-1, E-3 (explaining that mitigation measures will be evaluated annually or more frequently, and the monitoring plan may be modified annually as necessary).

The adaptive management plan relies on a review team that includes representatives from the Bureau and other interested parties. This team will develop specific quantifiable criteria to evaluate the project's adherence with the adaptive management performance goals. *ROD* at 3. The plan specifies a short-term disturbance goal for each well of no more than 6.5 acres and less in areas with sensitive populations or crucial or unique habitats. *Id.* at 12. The Record of Decision also discusses adapting monitoring efforts in response to observed trends, and outlines how funding will be obtained for said monitoring. *Id.* at 20.

While the exact application of mitigation measures will be determined on a site-specific basis, the adaptive management plan also incorporates a detailed, thirteen-page list of specific protective measures that the review team is to consider for each drill plan. *Id.* at 21 (referencing *FEIS* App'x L). Those measures include requiring operators to surround the areas around drill pads with hay or mulch to reduce hillslope erosion, *FEIS* at L-2, erecting signs near livestock pastures and corrals to warn vehicle operators, *id.* at L-4, limiting short-term surface

disturbance around sage grouse and Columbian sharp-tailed grouse habitats and big game crucial winter range, *id.* at L-4, and measures developed specifically for certain regions within the Atlantic Rim Project Area, *id.* at L-6–L-13. The list also provides reasons and explanations for all of the suggested measures.

As this description shows, the Atlantic Rim Project's EIS and Record of Decision outlined relatively detailed mitigation measures. In addition, these details were accompanied by discussions of environmental studies supporting the Bureau's decisions. *See, e.g.*, *FEIS* at 5-17–5-18 (citing external studies about the protection required for sage grouse habitats, along with the Bureau's own data about the number of sage grouse habitats in the Atlantic Rim Project Area and how many would be affected by the proposed development). We agree with the district court that "although the plaintiffs are dissatisfied with the level of protection provided under the current mitigation plan, the record clearly reflects that BLM analyzed and considered various alternatives and put in place measures far more stringent than those included in the original proposal." *TRCP*, 605 F. Supp. 2d at 275 (quoting *NRDC*, 525 F. Supp. 2d at 122). By setting forth both fixed mitigation measures and an adaptive management plan, the Record of Decision amply fulfills NEPA's mandate to discuss mitigation measures. We can require no more. *See Vermont Yankee*, 435 U.S. at 525.

Nor did the adaptive management plan violate NEPA's requirement to take a hard look at environmental impacts before actions are taken. *See* 40 C.F.R. § 1500.1(b). The procedural requirements of NEPA do not force agencies to make detailed, unchangeable mitigation plans for long-term development projects. Through the adapative management plan, the Bureau plans to monitor the real effects of the development it authorizes, and adapt its mitigation measures to specific drilling

proposals in response to trends observed. Allowing adaptable mitigation measures is a responsible decision in light of the inherent uncertainty of environmental impacts, not a violation of NEPA. It is certainly not arbitrary or capricious.

Appellants also argue the district court abused its discretion in excluding extra-record evidence regarding the adaptive management plan. Some of the excluded evidence allegedly supported Appellants' argument that a similar adaptive management plan in another project area was unworkable. As we discussed above, *supra* at 25, a court generally restricts its review to the administrative record. The district court did not abuse its discretion in maintaining that default position for the evidence in question. As with the wind project evidence, *see supra* at 26, the proper time for Appellants to introduce this evidence would have been in the notice and comment period before the agency, not before the district court. The district court did not abuse its discretion in excluding that evidence.

Appellants also sought to introduce a letter from the Bureau that allegedly showed that the Bureau was not actually implementing the Atlantic Rim adaptive management plan as outlined in the Record of Decision. Appellants' Br. at 55 (citing Letter from R. Bennett to T. Wilmoth (May 13, 2008)). In a subsequent mailing, however, the Bureau told Appellants that the statement in question was a mistake and that the process had already begun at the time of the first letter. The Bureau provided Appellants documentation for this contention. Given the Bureau's convincing and unrebutted explanation for the statement in its first letter, the district court did not abuse its discretion in refusing to consider this evidence either.

### *E. Multiple Use and Sustained Yield*

As explained above, *see supra* at 5, FLPMA requires the Bureau to "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). Appellants assert that the Atlantic Rim Project violated these mandates. Even though the Record of Decision stated that the Bureau factored in objectives other than maximizing natural gas recovery, *ROD* at 10, Appellants insist that provisions in the Atlantic Rim Project that envision some natural gas development to the permanent detriment of other uses "do[] not reflect FLPMA's intent to balance resource uses on the public lands." Appellants' Br. at 67.

But while the Bureau was to conform with the principles of multiple use and sustained yield, the chosen development alternative did not have to protect all current and possible uses. As the Bureau's decisions become more granular, the uses maximized by each project necessarily become more limited. Yet those decisions may still be part of the Bureau's overall management under the principles of multiple use and sustained yield. That is, while the Great Divide RMP must reflect a wide range of uses, the Atlantic Rim Project Area deals with a smaller area of land and can optimize a narrower range of uses. Each plan of development for the drilling of specific wells will optimize still fewer uses in that plan's limited acreage. As the district court stated, "each individual project and parcel of land need not, and cannot, reflect all FLPMA's purposes." *TRCP*, 605 F. Supp. 2d at 282. *See also S. Utah Wilderness Alliance Utah Chapter, Sierra Club*, 122 IBLA 165, 172 (1992) ("Multiple use is generally considered in the context of BLM's land-use planning [*i.e.*, RMPs].").

The Bureau has substantial discretion to decide how to achieve the multiple use and sustained yield objectives. In

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), the Supreme Court considered the Bureau's obligation under FLPMA to maintain wilderness study areas — roadless lands of at least 5000 acres that possess certain "wilderness characteristics" — "in a manner so as not to impair the suitability of such areas for preservation as wilderness." *Id.* at 59 (quoting 43 U.S.C. § 1782(c)).  The Court explained that the Bureau has "a great deal of discretion in deciding how to achieve" the goal of § 1782(c), even though the section "is mandatory as to the object to be achieved."  542 U.S. at 66.  The same applies to the goals listed in § 1732(a).  Though the Bureau must manage the Atlantic Rim Project Area under the principles of multiple use and sustained yield, 43 U.S.C. § 1732(a), the Bureau has wide discretion to determine how those principles should be applied.  We are satisfied the Atlantic Rim Project reflects those principles.  The 2000 well alternative the Bureau ultimately adopted is clearly a product of compromise among competing goals, and encompasses less drilling and more protection of other resources than the original proposal.  *See generally ROD* at 11–12 (comparing the proposal with other alternatives, including the "preferred alternative" that the Bureau adopted).  FLPMA the Bureau fulfilled its mandate under FLPMA.

### F. Notice and Comment on the PODs

Appellants' final argument is that the Bureau did not adequately involve the public when it developed environmental assessments (EAs) and approved plans of development (PODs) for various applications to drill within the Atlantic Rim Project Area.  Under NEPA, agencies must permit the public to "play a role in the decisionmaking process and the implementation of that decision."  *Methow Valley*, 490 U.S. at 349.  When a decision requires only an EA, rather than an EIS, agencies must still involve the public in the EA process "to the extent

practicable," 40 C.F.R. § 1501.4(b). Even when the agency makes a finding of no significant impact, as the Bureau did for the PODs in question, it must "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures," 40 C.F.R. § 1506.6(a); *id.* § 1501.4(e)(1). We hold that the Bureau adequately fulfilled these mandates in this case.

Between September 2005 and August 2006, the Bureau posted notice of the Catalina and Sun Dog drilling permit applications in the public reading room of the Bureau's regional office. *See NRDC*, 525 F. Supp. 2d at 120. In June and July 2007, the Bureau also posted on its website that it was preparing environmental assessments (EAs) for those sites. *See id.* However, none of the public notices supplied any specific environmental information about those applications. Nor did the Bureau ever release for public notice and comment any draft EAs on the PODs. Instead, information about site-specific environmental impacts was made public for the first time in June 2007 for the two Catalina PODs and August 2007 for the two Sun Dog PODs — when the Bureau released the final EAs simultaneously with the PODs' approval. In other words, the public was not informed about the environmental impacts of a specific plan to drill until the POD was already approved.

Yet the Bureau need not include the public in the preparation of every EA. In *TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006), we opined that "the agency has significant discretion in determining when public comment is required with respect to EAs." *Id.* at 861. Appellants argue that the Bureau abused this discretion because the Atlantic Rim Project EIS postponed site-specific environmental analysis until the POD approval process. They contend that by averting public comment at the EIS stage, then inhibiting public comment at the EA stage, the Bureau failed to

make "diligent efforts to involve the public." 40 C.F.R. § 1506.6(a). Appellants point out that the Bureau has posted draft EAs for public comment in the past. But the fact that the Bureau has provided draft EAs for public comment in some instances does not compel them to do so in every instance. When an agency prepares an EA accompanied by a finding of no significant impact, it must make the finding available for public review and comment only if the action would normally require the preparation of an EIS, or if "[t]he nature of the action is one without precedent." 40 C.F.R. § 1501.4(e)(2)(i)–(ii). *See also* 43 C.F.R. § 46.305(b) ("Publication of a 'draft' environmental assessment is not required."). Appellants never argued that either of those conditions is present in this case.

In addition, the fact that the Bureau did not publish draft EAs did not foreclose Appellants' opportunity to comment on the projects. When the district court denied preliminary injunctive relief to NRDC, the court highlighted the length of time between the Bureau's publication of notice of the applications (September 2005 and August 2006) and its release of the EAs and approval of the PODs (June and August 2007). Accordingly, the court found that Appellants "clearly had a substantial opportunity to comment on the proposals before they were approved." *NRDC*, 525 F. Supp. 2d at 120–21. They did not need to await the publication of a draft EA. The Appellants could have asked individually for the draft EAs when the Bureau posted the public notice, but they have pointed to no evidence that they did so. When the BLM posted public notices of later applications to drill, the Appellants did make requests to the BLM and the BLM did provide them with draft EAs. Indeed, Appellants commented on later draft EAs in the Sun Dog unit, and the Bureau responded to those comments in its subsequent EA. The Bureau gave public notice that it was considering the applications to drill and was preparing draft EAs, and did not foreclose public input or refuse to provide draft EAs upon

request even though it did not publish draft EAs for specific public comment. *Cf. Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1035 (D.C. Cir. 2008) (noting that the environmental petitioner "stated that [it] would address their NEPA notice claim" if the FCC would "update its website when it receives individual tower applications"). In sum, the Bureau acted within its discretion to afford public participation in EA drafting. It did not violate NEPA's prescription to include the public "to the extent practicable." 40 C.F.R. § 1501.4(b).

### III. Conclusion

Though Appellants raise claims of both procedural and substantive inadequacies in the Bureau's decisions concerning the Atlantic Rim Project, they have failed to show that any of those decisions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Nor did the district court abuse its discretion when it excluded extra-record evidence from its evaluation. Accordingly, the district court's decision is

*Affirmed.*