# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 20, 2011       Decided November 18, 2011

No. 10-5386

THEODORE ROOSEVELT CONSERVATION PARTNERSHIP,
APPELLANT

v.

KENNETH LEE SALAZAR, IN HIS OFFICIAL CAPACITY AS THE
SECRETARY OF THE UNITED STATES DEPARTMENT OF THE
INTERIOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01047)

———

*Thomas R. Wilmoth* argued the cause for appellant. With
him on the briefs was *Donald G. Blankenau.*

*Robert H. Oakley*, Attorney, U.S. Department of Justice,
argued the cause and filed the brief for federal appellees. *R.
Craig Lawrence*, Assistant U.S. Attorney, and *Justin R. Pidot*
and *David C. Shilton*, Attorneys, U.S. Department of Justice,
entered appearances.

*John F. Shepherd* argued the cause and filed the brief for appellees QEP Resources, Inc., SWEPI, LP, and Ultra Resources, Inc.

*James Kaste*, Senior Assistant Attorney General, Office of the Attorney General for the State of Wyoming, and *Affie Ellis*, Assistant Attorney General, were on the brief for *amicus curiae* State of Wyoming in support of appellees.

Before: SENTELLE, *Chief Judge*, ROGERS and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*:  The Pinedale Anticline Project Area (the PAPA) consists of a little over 198,000 acres of federal, state, and private land in western Wyoming.  The Bureau of Land Management (BLM or the Bureau) manages roughly 80 percent of this land, which contains the third-largest natural gas field in the United States.  In 2000, the Bureau issued a Record of Decision (2000 Record of Decision or 2000 ROD) meant to guide the management of the first substantial development of the PAPA's natural gas resources.  In 2008, the Bureau adopted a new Record of Decision (2008 Record of Decision or 2008 ROD), which, among other things, authorized the development of more natural gas wells than the earlier Record of Decision had sanctioned and provided for management and mitigation of the development.  Theodore Roosevelt Conservation Partnership (TRCP), an association including members who pursue recreational hunting in the PAPA, filed for declaratory and injunctive relief in the district court, arguing that the Bureau's 2008 Record of Decision violated the Federal Land Policy and Management Act; that the accompanying environmental impact statement (EIS) violated the National Environmental

Policy Act; and that the 2000 Record of Decision violated both acts. The district court granted summary judgment for the Bureau. TRCP appeals from that judgment. We affirm the judgment of the district court.

## I. Legal Framework

### A. The National Environmental Policy Act

The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et. seq.*, mandates that federal agencies "consider fully the environmental effects of their proposed actions." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010). As is well established, NEPA is "essentially procedural." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). It does not mandate "particular substantive environmental results"; rather, it "focus[es] Government and public attention on the environmental effects of proposed agency action." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989). Put simply, NEPA ensures "'a fully informed and well-considered decision, not necessarily' the best decision." *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 503 (quoting *Vermont Yankee*, 435 U.S. at 558). To this end, NEPA requires that an agency prepare an EIS for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

The EIS is a detailed analysis, prepared with expert assistance, of the projected environmental impact of a proposed major federal action. *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 503 (citing 42 U.S.C. § 4332(2)(C)). The EIS must explain the action's environmental impact as well as "any adverse environmental effects which cannot be avoided should the proposal be

implemented." 42 U.S.C. § 4332(2)(C)(i), (ii). This discussion must address the "relevant issues and opposing viewpoints" in sufficient detail to assure adequate evaluation of a proposed action's environmental effects. *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006).

At the "heart" of the EIS is the agency's evaluation of the potential environmental impacts of all "reasonable alternatives" for completing the action. *City of Alexandria v. Slater*, 198 F.3d 862, 866 (D.C. Cir. 1999) (quoting 40 C.F.R. § 1502.14). The EIS must "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. The range of reasonable alternatives must include "technically and economically practical or feasible" alternatives. 43 C.F.R. § 46.420(b). This range is "delimit[ed]" by the agency's reasonably defined goals for the proposed action. *City of Alexandria*, 198 F.3d at 867 (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991)).

## B. The Federal Land Policy and Management Act

The Bureau manages public lands pursuant to the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1701 *et. seq.* FLPMA mandates that the Bureau "manage the public lands under principles of multiple use and sustained yield." *Id.* § 1732(a). Multiple use management entails balancing competing uses of land, "including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values." 43 U.S.C. § 1702(c). Achieving a sustained yield "requires [the Bureau] to control depleting uses over time, so as to ensure a high level of valuable uses in

the future." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). In managing public lands according to these overarching principles, the Bureau must "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).

## II. Background

### A. *The Pinedale Anticline Project Area*

The PAPA encompasses just over 198,000 acres of federal, state, and private land in western Wyoming. It contains what is now considered the third-largest natural gas field in the United States (Pinedale Field). The PAPA also provides other natural resources, including recreational opportunities and wildlife habitat. In particular, the PAPA supports part of the "winter range" for mule deer and pronghorn, which serves as survival habitat during harsh winter conditions. The PAPA also provides year-round habitat for part of a significant population of the greater sage-grouse. This habitat includes mating-display grounds called leks as well as brood-rearing areas and wintering areas. Mule deer, pronghorn, and sage-grouse are game species of particular interest to this region's hunters.

The Bureau manages the roughly 80 percent of the federally owned land and resources in the PAPA. The government has leased most of its mineral resources, including most of the Pinedale Field, to oil and gas companies (the Operators). Energy development in the PAPA remained negligible until the 1990s, when new drilling technology allowed for commercially practicable recovery of the PAPA's natural gas.

## B.  The 2000 Record of Decision

Faced with increasing development interest, the Bureau released a Record of Decision in 2000 authorizing significant expansion of natural gas development in the PAPA.  *See* BUREAU OF LAND MANAGEMENT, RECORD OF DECISION FOR PINEDALE ANTICLINE OIL AND GAS EXPLORATION AND DEVELOPMENT PROJECT ENVIRONMENTAL IMPACT STATEMENT (July 2000) (2000 ROD).  The 2000 Record of Decision required monitoring and mitigation measures intended to preserve the PAPA's other natural resources. These measures included, among other things, restrictions on development tied to the seasonal needs of affected species, one-quarter-mile buffers around all sage-grouse leks, and a formal process called Adaptive Environmental Management (AEM) intended to monitor development and respond to adverse environmental impacts as they arose.

Over the next several years, development increased at a faster-than-predicted rate.  Several Operators requested, and the Bureau approved, a series of exceptions to seasonal restrictions on development as provided for in the 2000 Record of Decision.  Wildlife populations declined during this period, due at least in part to the increased natural gas development and the concomitant increase in human presence.   In 2005, the Operators proposed a new development plan that provided for additional wells, year-round drilling (i.e., lifting the seasonal restrictions on development introduced by the 2000 Record of Decision), and a concentrated development scheme.

## C.  The 2008 EIS

In response to the Operators' proposal, the Bureau prepared and issued a draft supplemental EIS in 2006 that

analyzed three alternatives addressing the Operators' proposal. Under Alternative A, the "no action" alternative, the Bureau would reject the Operators' proposal and continue management under the 2000 Record of Decision. Alternative B would essentially implement the proposal, including year-round drilling, 4,399 additional wells (drilled from 600 well pads), concentrated development, and mitigation measures. Alternative C was similar to Alternative B, but would decrease the core drilling area and specify where year-round drilling could not occur rather than specify only where year-round drilling could occur.

After receiving public and governmental input, the Bureau issued a revised draft supplemental EIS that included the three alternatives from the draft supplemental EIS along with two additional alternatives. Alternative D, the Bureau's preferred alternative, built upon Alternative C and added further mitigation measures and voluntary suspension of mineral leases on the land bordering the core area (the PAPA flanks). Alternative E also started with Alternative C but reduced the pace of development, retained the seasonal restrictions on development implemented by the 2000 Record of Decision, and authorized the construction of more well pads.

The Bureau issued the final EIS on June 27, 2008. *See* BUREAU OF LAND MANAGEMENT, FINAL SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT FOR THE PINEDALE ANTICLINE OIL AND GAS EXPLORATION AND DEVELOPMENT PROJECT (June 2008) (2008 EIS). The 2008 EIS states that the Bureau's purpose and need was "to act upon the [Operators'] proposal to revise the PAPA ROD to expand the level of development by drilling 4,399 new producing wells and to relax seasonal restrictions in certain areas[,] . . . with compensating protections for wildlife through limitation of

activity in other areas and additional mitigation measures in and outside of the PAPA." 2008 EIS at 1-9. It details the five alternatives addressing the Operators' proposal (Alternatives A-E), with Alternative D as the Bureau's preferred alternative.

## D. The 2008 Record of Decision

In September 2008, the Bureau adopted a Record of Decision based on its preferred Alternative D. BUREAU OF LAND MANAGEMENT, RECORD OF DECISION FOR THE SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT, PINEDALE ANTICLINE OIL AND GAS EXPLORATION AND DEVELOPMENT PROJECT (September 2008) (2008 ROD). By its terms, the 2008 Record of Decision superseded the 2000 Record of Decision. It authorized development of up to 4,399 wells on no more than 600 well pads (down from the 700 producing well pads authorized by the 2000 Record of Decision). The 2008 Record of Decision also included the following mitigation measures intended to minimize and offset the environmental impact of development:

- Cessation of seasonal restrictions on development for five development areas in the "core area" of the PAPA, which makes up 23 percent of the PAPA, along with concentrated development in the core area.

- "Geographically phased" development within each core development area—i.e., concentrated development that proceeds in stages in smaller areas rather than all at once.

- Voluntary suspension of the Operators' mineral leases on the PAPA flanks, and, for all but one

Operator, a prohibition on new development on the flanks even beyond the five-year period until comparable acreage in the core area has been returned to functional wildlife habitat.

- Various measures intended to reduce human impact, including directional drilling (which allows for more wells on each well pad and thus fewer well pads), a liquids-gathering system to reduce truck traffic, installation of computer-controlled systems for some Operators, and busing of work crews.

- A monitoring and mitigation fund "will be used for both on-site and off-site mitigation and project-related activities in the PAPA vicinity including additional air quality monitoring, additional wildlife, livestock, vegetation, and reclamation." 2008 ROD at 17. Operators were required to contribute at least $4.2 million initially, and they must pay into the fund for each well drilled up to a total of $36 million.

- A wildlife monitoring and mitigation matrix detailing measures for monitoring wildlife in the PAPA and sequential mitigation responses based on changes identified by that monitoring. The matrix includes triggers for mitigation for mule deer when the population declines from 2005–2006 levels by 15 percent.

Based on these mitigation measures—particularly the concentration of development in both area and duration—the Bureau reasoned that the 2008 Record of Decision would "afford superior crucial winter range and greater sage-grouse habitat in the long-term through reducing disturbance, both to

habitat and that caused by human presence, during the production phase." 2008 ROD at 24.

### E. Procedural History

TRCP filed in the district court a complaint seeking declaratory and injunctive relief against the Department of the Interior and the Bureau. QEP Resources, Inc., SWEPI, LP, and Ultra Resources, Inc.—three of the primary lessees of federally owned mineral rights in the PAPA—intervened as defendants. The district court granted summary judgment in favor of the Department of the Interior, the Bureau, and the intervenors. *Theodore Roosevelt Conservation P'ship v. Salazar*, 744 F. Supp. 2d 151, 165 (D.D.C. 2010). TRCP appeals.

### III. Analysis

We review *de novo* the district court's grant of summary judgment. *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 507. As neither FLPMA nor NEPA provides a private right of action, we review the Bureau's actions under the Administrative Procedure Act (APA), 5 U.S.C. § 501 *et seq*. *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 507. The APA requires that a reviewing court set aside any agency action, finding, or conclusion that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)).

TRCP advances several arguments for invalidating various Bureau actions and reversing the district court's grant of summary judgment:

(1) the Bureau violated NEPA by not including a reasonable range of alternatives in the 2008 EIS that supports the 2008 Record of Decision;

(2) the Bureau failed adequately to address in the 2008 EIS the proposed development's impact on hunting, thus failing to give hunting impacts the "hard look" review NEPA requires;

(3) the Bureau's determination that the 2008 Record of Decision's mitigation measures will prevent "unnecessary or undue degradation" of the PAPA, as FLPMA requires, was arbitrary and capricious; and

(4) the Bureau violated FLPMA and NEPA by failing to enforce the 2000 Record of Decision, and the district court erred when it determined that these claims were moot.

We address each argument in turn.

## A. *The Inclusion of a Reasonable Range of Alternatives in the 2008 EIS*

The Bureau considered in the 2008 EIS five alternatives addressing the Operators' proposal for expanded development of the PAPA. TRCP argues that by omitting an alternative calling for scaled-back development to comport with the 2000 Record of Decision, the Bureau violated NEPA regulations that mandate evaluation of "all reasonable alternatives." *See* 40 C.F.R. § 1502.14.

Regulations implementing NEPA (promulgated by the Council on Environmental Quality) require that an agency developing an EIS evaluate "all reasonable alternatives,"

including a no-action alternative. *Id.* An alternative is "reasonable" if it is objectively feasible as well as "reasonable in light of [the agency's] objectives." *City of Alexandria*, 198 F.3d at 867; *see also* 43 C.F.R. § 46.420(b) (defining "reasonable alternatives" as those alternatives "that are technically and economically practical or feasible and meet the purpose and need of the proposed action").

Because "[t]he goals of an action delimit the universe of the action's reasonable alternatives," *Citizens Against Burlington*, 938 F.2d at 195, determining whether an agency has included all reasonable alternatives requires us to decide first whether the agency has reasonably defined its stated goals. *See City of Alexandria*, 198 F.3d at 867. An agency determining its objectives for an action "should consider the needs and goals of the parties involved in the application or permit as well as the public interest." 43 C.F.R. § 46.420(a)(2). But "[i]t is the *[B]ureau's* purpose and need for action that will determine the range of alternatives and provide a basis for the selection of an alternative in a decision." *Id.* (emphasis added). The agency should also "always consider the views of Congress" to the extent they are discernible from the agency's statutory authorization and other directives. *Citizens Against Burlington*, 938 F.2d at 196.

Importantly, we review both an agency's definition of its objectives and its selection of alternatives under the "rule of reason." *Citizens Against Burlington*, 938 F.2d at 195-96; *see also City of Alexandria*, 198 F.3d at 867 (stating that both of these inquiries demand "considerable deference to the agency's expertise and policy-making role"). That is, as long as the agency "look[s] hard at the factors relevant to the definition of purpose," we generally defer to the agency's reasonable definition of objectives. *Citizens Against*

13

*Burlington*, 938 F.2d at 196. Of course, we will reject an "unreasonably narrow" definition of objectives that compels the selection of a particular alternative. *Id.* If the agency's objectives are reasonable, we will uphold the agency's selection of alternatives that are reasonable in light of those objectives. *Id.*; *City of Alexandria*, 198 F.3d at 867.

As noted, we begin by determining whether the Bureau reasonably defined its objectives for this action. It did. The EIS expressly states that the Bureau's purpose and need was "to act upon the Proponents' proposal to revise the PAPA ROD to expand the level of development by drilling 4,399 new producing wells and to relax seasonal restrictions in certain areas." 2008 EIS at 1-9. This objective was reasonable under the circumstances: In light of the discovery of significantly more recoverable natural gas in the PAPA than had been anticipated, the Operators approached the Bureau with a specific proposal that would permit recovery of these resources while mitigating environmental impact. Rather than choosing a broad or open-ended objective, the Bureau reasonably chose to confine its goal simply to addressing this proposal.

Such an objective plainly takes into account the "needs and goals of the parties involved" by directly addressing the Operators' proposal. *See Citizens Against Burlington*, 938 F.2d at 196 ("When an agency is asked to sanction a specific plan . . . the agency should take into account the needs and goals of the parties involved . . . .").

TRCP calls the Bureau's stated objective "unreasonably narrow" because it focuses only on the Operators' need to increase production, but TRCP misreads the Bureau's explicit statement of purpose and need. The Bureau does not state a purpose to *enact* or *adopt* the Operators' proposal to some

degree; rather, its purpose is to "act upon" that proposal. The former language might be unreasonably narrow to the extent it presupposes approval of the proposal, thereby limiting the alternatives to be analyzed to only those that would enact the proposal. *See Citizens Against Burlington*, 938 F.2d at 196. The EIS, however, simply states that the Bureau's intent was to "act upon" the proposal—i.e., to decide *whether* to adopt the proposal at all, and if so, to what degree. This objective permits a reasonable range of alternatives that either reject the proposal or adopt it to varying degrees or with alterations.

TRCP would prefer that the Bureau choose a broader purpose: "to manage the PAPA properly in light of eight years of degradation that was inconsistent with its prior NEPA projections and the 2000 ROD." Appellants' Reply Br. at 11. TRCP seems primarily concerned that the Bureau did not address, in *this* action, the decline in PAPA wildlife populations that has occurred since 2000. But it is reasonable for the Bureau to have chosen to tackle these declines first in the context of the Operators' proposal. Even if the Bureau had determined after environmental analysis that the wildlife declines necessitated a scaling back of development rather than expansion or maintenance of the status quo, it could have rejected the proposal using the alternatives it included (i.e., chosen the no-action alternative), and then, in a separate step, initiated a plan of its own to address the declines as needed. TRCP provides no authority suggesting that the Bureau was required to lump together all possible management actions in the 2008 EIS.

Given the Bureau's purpose for its action, it chose a reasonable range of alternatives. The Bureau evaluated five alternatives in the 2008 EIS addressing the Operators' proposal. One alternative rejected the proposal, another implemented the proposal in full, and three alternatives

implemented modified versions of the proposal that differed primarily in the degree of mitigation required and the size of the core area available for year-round drilling. The Bureau's preferred alternative altered the Operators' proposal by requiring additional mitigation measures and extracting a commitment from the Operators to suspend their leases on the PAPA flanks for at least five years to further the overall mitigation scheme. Another alternative would have reduced the pace of development in the PAPA by retaining the 2000 Record of Decision's seasonal restrictions on development.

These alternatives provided a reasonable range of possible actions addressing the proposal. This range of alternatives allowed the Bureau to "act upon" the proposal in the most logical ways it could do so: by (1) rejecting the proposal, (2) approving the proposal "as is," or (3) approving the proposal with some degree of modification. As the district court stated, "[g]iven the decision the [Bureau] faced—that is, whether . . . to act upon the lease-holders' proposal—it was reasonable to examine different ways in which that proposal could be implemented compared against a baseline of no action." *Theodore Roosevelt Conservation P'ship*, 744 F. Supp. 2d at 161.

TRCP argues that the Bureau was required to analyze an additional alternative that would cap or scale back development and return wildlife populations that existed at the adoption of the 2000 Record of Decision because the Bureau's original goal for managing the PAPA was to maintain its wildlife populations at those levels. But TRCP's premise is flawed. TRCP relies on a statement in a wildlife protection plan authored by a Bureau consultant, pursuant to the 2000 Record of Decision, stating that the plan will "assist land managers and project personnel in efforts to achieve and maintain desired levels of wildlife populations on the PAPA

(e.g. pre-project levels)." However, as the Bureau correctly points out, this is by no means a formal statement that the Bureau's management goal was or is to prevent any decline in wildlife populations, nor does it serve as a binding mandate. In fact, the 2000 Record of Decision itself explicitly aimed to "allow[] for natural gas exploration and development while continuing to provide for the existing principal and major uses . . . for this area (e.g., domestic livestock grazing, fish and wildlife habitat protection . . .)." 2000 ROD at 1. Nothing in the record demonstrates that preventing *all* declines in wildlife populations was ever the Bureau's management objective. And of course, more important, the 2008 EIS confirms that the Bureau's purpose for its present action was limited to addressing the Operators' specific proposal. The Bureau selected a reasonable range of alternatives in light of its purpose; it was under no obligation to include a scaled-back-development alternative that would not "bring about the ends of the federal action." *City of Alexandria*, 198 F.3d at 867 (quoting *Citizens Against Burlington*, 938 F.2d at 195) (internal quotation marks omitted).

## B. Analysis of the Environmental Impact on Hunting in the 2008 EIS

The 2008 EIS specifically identified as a public concern the proposed development's potential impact on hunting. TRCP argues that the Bureau violated NEPA by failing adequately to analyze the potential impact on hunting in the PAPA.

Under NEPA, an agency must take a "hard look" at the environmental effects of its proposed action. *Nevada v. Dep't of Energy*, 457 F.3d 78, 92-93 (D.C. Cir. 2006). The focus of the "hard look" doctrine is to "ensure that the agency has adequately considered and disclosed the environmental

impact of its actions and that its decision is not arbitrary or capricious." *Id.* at 93 (citing *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S 87, 97-98 (1983)). The rule of reason applies here as well. *Id.* We have consistently declined to "'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor." *Id.* (citations omitted).

The Bureau sufficiently analyzed the proposed action's impact on hunting in its 2008 EIS. It recognized that big-game hunting is a "major recreational activity in the PAPA" and that "[v]arious game bird species" are also hunted. 2008 EIS at 3-49. The Bureau concluded that hunting opportunities will decrease in the PAPA under any of its five alternatives due to "decreased abundance of big game and upland game birds from increased density of wellfield development and . . . surface disturbance." 2008 EIS at 2-62. The impact would increase under alternatives B through E due to increased surface disturbance. *Id.*

Several parts of the record support this conclusion. First, the Bureau indicated that "[i]t is generally assumed" that "benefits-based recreation" like hunting will generally decline in areas commonly used for such activities "when the landscape and its qualities are changed by development." 2008 EIS at 3-48. The Bureau cited "[n]oise, odor, increased traffic, dust, changes in setting, and other competing factors from development" as "intrusive" factors that cause recreationists to avoid these areas. *Id.* The Bureau also stated that "hunters may find it unsafe to use some areas because of the density of development, or they may have a less rewarding experience if project activities affect wildlife populations in the area." 2008 EIS at 4-54. It then pointed out that while hunting recreation-days increased slightly in the Bureau Pinedale Field Office Administrative Area, hunting

recreation-days in and near the PAPA declined from 2001 to 2006 during the first wave of development. 2008 EIS at 3-49.

The Bureau also engages in detailed analysis of the proposed development's effects on the wildlife the TRCP members hunt, including mule deer and greater sage-grouse. This analysis concludes that surface disturbance and loss of habitat function are likely to adversely impact the populations of several game species. Given the direct and intuitive link between a decrease in game species and a corresponding decrease in opportunities to hunt those species, such an analysis reasonably supports the Bureau's conclusion that hunting opportunities are likely to decrease. Taken as a whole, the Bureau's analysis of the proposed development's impact on game species and hunting opportunities is "tolerably terse" rather than "intolerably mute." *See City of Alexandria*, 198 F.3d at 870-71. We conclude that the Bureau's discussion satisfies its hard-look mandate.

## C. The Bureau's Determination that the 2008 Record of Decision Prevents Unnecessary or Undue Degradation

The Bureau's 2008 Record of Decision permits significant expansion of energy development in the PAPA. It also implements measures intended to mitigate the adverse environmental effects of the development. TRCP asserts that the 2008 Record of Decision violates FLPMA because these measures will fail, leaving in place a development plan that degrades the environment without mitigation.

FLPMA requires that the Bureau, in managing public lands, "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). The Department of the Interior's Board of Land Appeals has interpreted "unnecessary or undue degradation" to mean the

occurrence of "something more than the usual effects anticipated" from appropriately mitigated development. *Biodiversity Conservation Alliance*, 174 I.B.L.A. 1, 5-6 (March 3, 2008). Application of this standard is necessarily context-specific; the words "unnecessary" and "undue" are modifiers requiring nouns to give them meaning, and by the plain terms of the statute, that noun in each case must be whatever actions are causing "degradation." *See, e.g.*, *Utah v. Andrus*, 486 F. Supp. 995, 1005 n.13 (D. Utah 1979) (defining "unnecessary" in the mining context as "that which is not necessary for *mining*") (emphasis added). Here, that action is the development required to extract natural gas from the PAPA's formidable reserves. Our inquiry, then, is whether the record supports the Bureau's determination that the 2008 Record of Decision will implement sufficient measures to prevent degradation unnecessary to, or undue in proportion to, the development the Record of Decision permits.

We also must view FLPMA's "unnecessary or undue degradation" standard in light of its overarching mandate that the Bureau employ "principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). While these obligations are distinct, they are interrelated and highly correlated. The Bureau must balance multiple uses in its management of public lands, including "recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values." 43 U.S.C. § 1702(c). It must also plan for sustained yield—"control [of] depleting uses over time, so as to ensure a high level of valuable uses in the future." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). Thus, by following FLPMA's multiple-use and sustained-yield mandates, the Bureau will often, if not always, fulfill FLPMA's requirement that it prevent environmental degradation because the former principles already require the Bureau to balance potentially degrading uses—e.g., mineral

extraction, grazing, or timber harvesting—with conservation of the natural environment. If the Bureau appropriately balances those uses and follows principles of sustained yield, then generally it will have taken the steps necessary to prevent unnecessary or undue degradation.

In light of FLPMA's multiple-use and sustained-yield mandates, the Bureau did not act arbitrarily or capriciously in determining that the plan in the 2008 Record of Decision will prevent unnecessary or undue degradation of the PAPA. In adopting the 2008 Record of Decision, the Bureau recognized the primary competing uses of the PAPA: the recovery of natural gas from the third-largest natural gas field in the continental United States and recreational use of the PAPA's other natural resources. Pursuant to its multiple-use mandate, the Bureau decided to allow additional natural gas extraction in the PAPA while implementing significant measures to mitigate the degradation the Bureau conceded would be necessary to allow significant recovery. The record supports the Bureau's determination that these mitigation measures would be adequate to prevent degradation that is unnecessary to, or undue in proportion to, the natural gas development that the 2008 Record of Decision permits.

The record shows that human presence constitutes the primary source of harm to the game species with which TRCP is primarily concerned. The mitigation scheme of the 2008 Record of Decision is geared towards reducing human presence while still allowing for development. Indeed, several parts of the mitigation scheme, including computer-assisted remote monitoring of wells, directional drilling from fewer well pads, busing of crews, centralized processing and storage, and a liquids-gathering system, are intended to reduce human presence in the PAPA year-round. The Bureau could reasonably conclude that these mitigation measures would

adequately serve to prevent unnecessary or undue degradation of wildlife by reducing harmful human presence. Indeed, the Wyoming Game & Fish Department (WGFD) expressly recommended these measures for precisely this purpose. Letter from Terry Cleveland, Director, WGFD, to Matt Anderson Pinedale Field Office, Bureau of Land Management (Apr. 6, 2007) (WGFD Letter).

Other measures required by the 2008 Record of Decision also target human presence. The Record of Decision concentrates development necessary to recover natural gas in a core area of the PAPA while leaving undeveloped large contiguous blocks of wildlife habitat, including critical winter range, on the PAPA flanks. As well pads in the core area are fully reclaimed, they are to be returned to functioning habitat. Lifting seasonal development restrictions will accelerate this habitat reclamation. Further, most of the Operators will only be allowed to begin developing the flanks at the later of five years or when comparable acreage in the core area is returned to functional habitat. This will leave 49,903 acres undisturbed. WGFD recommended these steps because they would benefit wildlife by "retaining the maximum amount of functional habitat for wildlife over as much of the project area as possible throughout delineation, development and production of the field." WGFD Letter. The Bureau could reasonably conclude that this phased, accelerated development scheme would aid in preventing unnecessary or undue degradation by limiting the amount of human presence and leaving functional habitat available at all times.

In addition to these impact-reducing measures, the 2008 Record of Decision requires a monitoring and mitigation fund for on- and off-site mitigation as needed. It also incorporates a Monitoring and Mitigation Matrix that sets forth a sequence of mitigation measures, some to be implemented immediately

and others to be used as a backstop in the event of further wildlife declines.

TRCP does not carry its burden of showing that the Bureau acted arbitrarily and capriciously. TRCP points to various statements in the record to support its assertion that the mitigation measures the Bureau has implemented in the 2008 Record of Decision will fail, leaving in place development without accompanying mitigation. As an initial matter, however, TRCP failed to address several important mitigation measures upon which the Bureau also relied to make its determination. Further, as to the measures TRCP does address, other statements in the record draw conclusions contrary to TRCP's. For example, TRCP contends that there is no evidence that removing the seasonal restrictions on development will benefit wildlife, but the same comment log upon which TRCP relies for this assertion goes on to state that past and ongoing studies have not been able to show that continuing the seasonal restrictions will provide effective mitigation either. Additionally, as the district court noted, WGFD supported removing the seasonal restrictions on development because the overall mitigation plan contained "longer-term" and "significantly better" benefits for wildlife than the measures in place in the 2000 Record of Decision. WGFD Letter.

Even where TRCP offers evidence that a particular mitigation measure likely will be ineffective, it fails to provide any other solution that still would permit significant recovery of natural gas—a use FLPMA requires the Bureau to balance with conservation. Specifically, TRCP argues that there is no evidence that the Bureau's one-quarter-mile buffer for greater sage-grouse leks will prevent the sage-grouses from abandoning their leks or attending in smaller numbers. The Bureau concedes that one-quarter-mile buffers "will not

avoid adverse consequences to the greater sage grouse," but the record shows that TRCP's recommended two-mile buffer would prevent natural gas extraction in nearly the entire PAPA. Again, FLPMA prohibits only unnecessary or undue degradation, not *all* degradation.

In sum, the Bureau could reasonably conclude that the mitigation measures the 2008 Record of Decision implements, which comport with WGFD recommendations and utilize reasonably available technology, will prevent unnecessary or undue degradation by (1) reducing the footprint and duration of human presence, (2) providing funding for and oversight of monitoring and mitigation, and (3) specifying additional mitigation measures to be implemented if further declines in wildlife populations are observed. TRCP's arguments to the contrary—pointing out the ineffectiveness of a few of the specific mitigation measures in place while failing to offer feasible alternatives that would still allow for significant development and ignoring conflicting evidence in the record—do not establish that the Bureau's determination was arbitrary or capricious. We conclude that the record supports the Bureau's determination that the measures implemented by the 2008 Record of Decision will prevent unnecessary or undue degradation of the PAPA.

## D. *Mootness of the Claims Based on Non-Enforcement of the 2000 Record of Decision*

Before the district court, TRCP also alleged that the Bureau violated FLPMA and NEPA by not adhering to requirements found in the 2000 Record of Decision. The district court deemed these claims moot because the 2008 Record of Decision superseded the 2000 Record of Decision. TRCP asserts that the district court erred and that these claims remain justiciable. We agree with the district court. TRCP's

claims based on violations of the 2000 Record of Decision are moot.

Article III limits the jurisdiction of federal courts to "actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317-18 (1988). We have "no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). If it becomes "impossible for the court to grant 'any effectual relief whatever' to a prevailing party" on a particular claim, that claim must be dismissed. *Id.* (quoting *Mills*, 159 U.S. at 653).

TRCP seeks relief for alleged FLPMA and NEPA violations based on the Bureau's failure to enforce the 2000 Record of Decision. But that Record of Decision no longer exists; the Bureau's 2008 Record of Decision superseded the 2000 Record of Decision "in its entirety." 2008 ROD at 1. At that time, it became impossible to grant any prospective relief for a failure to enforce the 2000 Record of Decision. We can neither invalidate, nor require the Bureau to adhere to, a Record of Decision that has "disappeared into the regulatory netherworld." *Nw. Pipeline Corp. v. FERC*, 863 F.2d 73, 77 (D.C. Cir. 1988).

TRCP suggests that its claims are not moot because we can grant relief for violations stemming from the 2000 Record of Decision by invalidating parts of the *2008* Record of Decision and requiring the Bureau to rewrite it to mitigate any degradation caused by those violations. That is, even if the 2008 Record of Decision is *valid*, TRCP argues that we should nevertheless *in*validate it if we find that the Bureau violated NEPA or FLPMA in its execution of the superseded

2000 Record of Decision. This we cannot do. If the 2008 Record of Decision is valid, it is valid. We are not going to invalidate a valid Record of Decision to remedy the alleged non-enforcement of an earlier Record of Decision which has no current force or effect.

TRCP argues that even if these claims would otherwise be moot, the mootness doctrine provides an exception for them because the violations asserted are "capable of repetition, yet evading review." *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911). Even if the alleged violations satisfy the "evading review" requirement, they are not "capable of repetition." An action is "capable of repetition" only if there is a "reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975). The "same action" generally refers to "particular agency policies, regulations, guidelines, or recurrent identical agency actions." *Pub. Utilities Comm'n v. FERC*, 236 F.3d 708, 715 (D.C. Cir. 2001). TRCP provides no reason to expect that its members will again be subjected to the "same action." It is certainly unreasonable to expect the Bureau to repeat violations based on the 2000 Record of Decision itself because that Record of Decision has been superseded. Moreover, even if a new and substantively distinct violation based on the new and different 2008 Record of Decision could be considered the "same action," TRCP has provided no evidence—beyond the alleged past violations of a superseded Record of Decision—that the Bureau will commit any such violation. Our general presumption that a federal agency will follow its own regulations therefore stands, *see Friends of Earth, Inc. v. EPA*, 446 F.3d 140, 148 (D.C. Cir. 2006), and TRCP's final argument that we should adjudicate its claims based on the 2000 Record of Decision fails.

## IV. Conclusion

In short, the Bureau considered a reasonable range of alternatives in the EIS addressing the proposal to expand natural gas development in the PAPA. That EIS sufficiently addressed the proposed action's impact on hunting in the PAPA. The record supports the Bureau's determination that the 2008 Record of Decision will prevent unnecessary or undue degradation of the PAPA. Finally, TRCP's claims based on the Bureau's alleged non-enforcement of the 2000 Record of Decision are moot. The judgment of the district court is affirmed.